# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 3:19sw 97 |
| *or identify the person by name and address)* | ) | |
| The entire premises located at 5063 Larry Lane, | ) | |
| Fredericksburg, VA 22407 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 846 | Conspiracy to Distribute and Possess with Intent to Distribute Heroin |

The application is based on these facts:
See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher G. Healy, SA FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 13, 2019

/S/
David J. Novak
United States Magistrate Judge
*Judge's signature*

City and state: Richmond, VA

Honorable David J. Novak, U.S. Magistrate Judge
*Printed name and title*



APR 1 3 2018

CLERK, U.S. DIST COURT
Phoenix, Arizona

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 5063 LARRY LANE, FREDERICKSBURG, VIRGINIA 22407, AND A 2018 DODGE CARAVAN | Case No. 3185SW97 ⅋3195W98

UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Christopher G. Healy, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the premises known as 5063 Larry Lane, Fredericksburg, Virginia 22407, (hereafter the "TARGET LOCATION"), and the search of a gray, 2018 Dodge Caravan (hereafter the "TARGET VEHICLE), both more particularly described in Attachment A.

2.      I have been a Special Agent with the FBI since July 2012.  I am currently assigned to the Richmond Field Office, Fredericksburg Resident Agency, located in Fredericksburg, Virginia.  I am responsible for criminal investigations including, but not limited to, gangs and drug trafficking organizations.

3.      I have participated in investigations involving the unlawful possession, possession with the intent to distribute, and distribution of controlled substances, and their associated conspiracies in violation of Title 21, United States Code, Sections 841 and 846.  I have participated in drug investigations involving the use of a variety of law enforcement techniques, including the use of confidential sources and undercover officers, physical surveillance,

electronic surveillance, pen registers, telephone toll analysis, investigative interviews, the
preparation and execution of search and arrest warrants, and reviews of taped conversations
involving drug traffickers.

4.      Through my training and experience, I have become familiar with the methods
and techniques associated with the distribution of narcotics and the organization of drug
conspiracies.

5.      Based on my training, experience, and participation in narcotics and drug-related
investigations, and the training and experience of other Agents/TFOs with whom I am working
on this investigation, I know that:

   a.   Narcotics traffickers often maintain on hand large amounts of U.S. currency in
        order to maintain and finance their ongoing narcotics business, which are
        typically proceeds of narcotics trafficking;

   b.   Narcotics traffickers maintain books, records, receipts, notes, ledgers, money
        orders, cashier check receipts, and other papers relating to the transportation,
        ordering, sale, and distribution of controlled substances, even though such
        documents may be in code. Narcotics traffickers often "front" narcotics (provide
        controlled substances on consignment) to their clients and maintain records to
        account for the narcotics fronted and the monies owed for those illegal narcotics.
        These books, records, receipts, notes, ledgers, and other documents are commonly
        maintained where narcotics traffickers have ready access to them, including, but
        not limited to, residences, offices, vehicles, and storage places;

   c.   Narcotics traffickers commonly maintain addresses or telephone numbers in
        books or papers which reflect names, addresses, and/or telephone numbers for

2

their associates in the narcotics trafficking organization; these items are typically written in code, and these types of records are sometimes maintained on computers or other electronic data storage devices, including cell phones;

d. Narcotics traffickers keep paraphernalia for packaging, cutting, weighing, and distributing controlled substances, which includes, but is not limited to scales, plastic wrap, wax paper, vacuum sealers, and cutting agents;

e. Narcotics traffickers commonly utilize telephones, both residential and cellular, and computers and tablets as a means of communication to conduct their illegal narcotics trafficking, and these devices often store contact phone numbers, numbers dialed and numbers from calls received, as well as other stored electronic communications such as text messages, direct messages, and other messaging programs;

f. It is common for narcotics dealers to possess weapons, including stolen weapons and exchange narcotics for such weapons or other stolen goods. Weapons are commonly used by narcotics dealers as an item of investment and for protection from robberies by other narcotics dealers;

g. In my experience, illegal narcotics trafficking is a continuing activity that spans months and even years. Illegal narcotics traffickers will repeatedly obtain and distribute controlled substances on a regular basis, such as any distributor of a legitimate commodity would purchase stock, and similarly, such narcotics traffickers will have an "inventory" which will fluctuate in size depending upon the supply and demand for the product.

3

## BASIS FOR FACTS SET FORTH IN AFFIDAVIT

6. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation. Conclusions I have reached herein are based on my training, my experience with the FBI, my participation in the investigations of narcotics organizations, and upon information I believe to be reliable from the following sources:

 a. Oral and written reports about this investigation received from Special Agents and Task Force Officers of the FBI and other local law enforcement partners;

 b. Controlled purchases of heroin, specifically those made by an undercover Agent;

 c. Observations made by investigators during the physical surveillance of LAW, ZIA, and others;

 d. Interviews of subjects known to interact with LAW; and

 e. Telephone records, including toll records, subscriber information, pen register data, and cell tower location information.

7. Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer had personal knowledge of the information or received it from another law enforcement officer with personal knowledge.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## RELEVANT STATUTORY PROVISIONS

9.     Based upon investigative activity conducted to date, further detailed below, I believe contraband and evidence of a crime, fruits of a crime, and instrumentalities of the following violations are located within the TARGET LOCATION and TARGET VEHICLE:

     a.  possess with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1);

     b.  conspiracy to possess with intent to distribute and distribute of controlled substances, in violation of 21 U.S.C. § 846;

## PROBABLE CAUSE

10.     In April 2018, the Fredericksburg Regional Narcotics Task Force (FRNTF) developed a confidential human source (CHS) who identified AARON TALLEY and members of his family as distributors of heroin in the Fredericksburg, Virginia area. At the time of the CHS's information, TALLEY was out on bond following charges in the City of Fredericksburg for distribution of heroin. TALLEY, a five-time convicted felon, has multiple drug related charges in his criminal history.

11.     Between April 2018, and September 2018, the CHS, accompanied by an undercover agent (UC) from the FRNTF, conducted multiple controlled purchases of heroin (confirmed via field screening tests or laboratory analysis) from TALLEY. Over time, TALLEY was comfortable with the presence of the UC, and began selling heroin directly to the UC.

12.     On March 4, 2019, TALLEY was charged via a criminal complaint in the Eastern District of Virginia for one of the aforementioned UC purchases of heroin. Although the complaint only referenced one UC purchase, multiple UC purchases have been made from

TALLEY. During the conduct of most of those buys, TALLEY, S. LAW, or Y. LAW were observed leaving from the TARGET LOCATION to meet and sell heroin to the UC.

13. Historically, the UC contacted TALLEY at 540-419-9648 to arrange and complete controlled purchases.

14. On February 4, 2019, a search warrant for location data and a pen register order, authorized in the Eastern District of Virginia, was obtained on TALLEY's telephone number, 540-419-9648. Analysis of the cell phone location data, coupled with physical surveillance, revealed TALLEY's cell phone was routinely either in or around the TARGET LOCATION before, during, and after controlled purchases.

15. On March 2, 2019, pursuant to an arrest warrant issued in the City of Fredericksburg for distribution of controlled substances, TALLEY was arrested during a traffic stop upon his return from a one day, up-and-back trip to New Jersey. At the time of TALLEY's arrest, his girlfriend, Y. LAW, and friend, ZIA, were riding in the TARGET VEHICLE.

16. A Virginia State Police narcotics dogs alerted to the presence of drugs in the TARGET VEHICLE, specifically in the trunk and front passenger seat area. However, a search of the TARGET VEHICLE revealed no drugs. That evening, Y. LAW left in the TARGET VEHICLE, which was seen parked at TARGET LOCATION in the days following TALLEY's arrest.

17. On March 3, 2019, in the hours following TALLEY's arrest, the pen register for telephone number 540-419-9648 still showed incoming and outgoing phone call and text message activity.

6

18. On March 3, 2019, the UC contacted 540-419-9648. Y. LAW answered the phone and told the UC she would take care of selling the UC heroin from now on. The UC told Y. LAW he was interested in purchasing two grams of heroin within the next few days.

19. On March 4, 2019, the UC texted 540-419-9648 to arrange the purchase of heroin. Shortly thereafter, the UC called the phone number. S. LAW, nephew of Y. LAW, answered the phone. S. LAW told the UC he already knew the UC's order because he had spoken to Y. LAW.

20. S. LAW directed the UC to a hotel in Fredericksburg, VA. Once near the hotel, the UC again called 540-419-9648. Y. LAW answered and told the UC that S. LAW was on his way to the hotel, and to look for a gray mini-van.

21. Surveillance units observed a gray mini-van, which was determined to be the TARGET VEHICLE, depart from TARGET LOCATION.

22. The UC and surveillance units observed the TARGET VEHICLE arrive at the hotel and park next to the UC. The UC got out of his vehicle and into the TARGET VEHICLE, wherein S.LAW completed a sale of $200 of a substance believed to be heroin to the UC. Upon completion of the sale, surveillance units observed the TARGET VEHICLE return to TARGET LOCATION.

23. On March 6, 2019, the UC contacted Y. LAW at 540-419-9648. Y.LAW asked the UC what he needed. After the UC told Y.LAW he was looking for two grams of heroin, Y. LAW directed the UC to a gas station, and told him to call her upon his arrival. After arriving at the gas station, Y. LAW directed the UC to Lavelle Drive, Fredericksburg, VA, one block away from the TARGET LOCATION.

24. The UC parked on Lavelle Drive, Fredericksburg, VA, and called Y. LAW. Shortly thereafter, surveillance units observed ZIA depart the TARGET LOCATION on a

7

bicycle, and meet the UC on Lavelle Drive. ZIA placed his bicycle in the back seat of the UC's car, got into the front seat, and completed the sale of $200 of a substance believed to be heroin to the UC as they drove around the block.

25.     On March 3, 2019, TALLEY made a call from Rappahannock Regional Jail to Y. LAW at 540-376-5310. During the call, TALLEY asked Y. LAW "if she got that candy." Y.LAW responded she did not have the candy, but "it's there." TALLEY repeatedly told Y. LAW "no" and that they "can't take no chances." Y. LAW responded she would "move the candy."

26.     In January 2018, while in Rappahannock Regional Jail with pending drug-related charges, TALLEY made a similar call to Y. LAW. During that call, TALLEY asked Y. LAW if "the bag of candy you put up, was it straight?"

27.     Your affiant believes "candy" is a code word TALLEY and Y. LAW use to describe heroin. In each of the aforementioned jail calls from TALLEY to Y. LAW, TALLEY was asking Y. LAW the status of their heroin supply. In each instance, Y. LAW was complicit in hiding heroin in the event of future law enforcement activity.

28.     Based on the foregoing, agents believe Y. LAW uses the TARGET LOCATION to store heroin and cash associated with heroin sales. Additionally, agents believe Y. LAW uses TARGET LOCATION as a base of operations to direct other members of the conspiracy, namely S. LAW and ZIA, is their distribution of heroin.

29.     Further, based on Virginia DMV records, physical surveillance, UC purchases of heroin, CHS reporting, cell phone location data, review of jail phone calls between TALLEY and Y. LAW, and police reports from the Fredericksburg Police Department, LAW's primary residence is believed to be TARGET LOCATION.

## CONCLUSION

30.     Based on the facts and circumstances outlined above, your affiant believes Y.

LAW is distributing and storing heroin the TARGET LOCATION, and in the TARGET

VEHICLE, and there is presently concealed those items that constitute fruits, instrumentalities,

and evidence of violations of 21 U.S.C. § 841 and §846.  Therefore, your affiant requests a

search warrant for the TARGET LOCATION, including the entire premises and outbuildings

and vehicles within its curtilage, as well as a search warrant for the TARGET VEHICLE,

wherever found, both more fully described in Attachment A, and to seek the items described in

Attachment B.

Respectfully submitted,

CHRISTOPHER HEALY
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me
on March 13, 2019:

/S/
David J. Novak
United States Magistrate Judge

9

## **ATTACHMENT A**

1.     The residence at 5063 Larry Lane, Fredericksburg, VA 22407, known as

TARGET LOCATION, is described as a single family home with an attached garage.  It is a two

story structure with tan stucco and red siding exterior. The number "5063" is on the red siding to

the left of the front entry door. The front door is white and the windows have tan shutters. The

following picture is attached for reference:



2.     The TARGET VEHICLE is described as a gray, 2018 Dodge Caravan, New York

license plate HZK 8477, VIN 2C4RDGEG7JR223685.

# ATTACHMENT B

## The entire premises and curtilage of the residence and vehicle described in Attachment A

a. Indicia of occupancy, residency, control and/or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, and bank records;

b. Drug paraphernalia including materials for cutting, weighing, and packaging controlled substances;

c. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, digital images, PDA's, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of co-conspirators in narcotics trafficking activities;

d. Narcotics and money ledgers, firearms, narcotics distribution and customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

e. United States currency derived from the sale of controlled substances in violation of Title 21, United States Code, Section 841 and 846;

f. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, financial transfers, which reflect the money generated from the sale of controlled substances in violation of Title 21, United States Code, Section 841 and 846;

g. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashier's checks, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money; money counting machines, money wrappers and bags used to carry controlled substances;

h. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sale of controlled substances;

i.  Records, items, and documents reflecting travel for the purpose of participating in narcotics trafficking, including bus and train tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps, and written directions to locations;

j.  The government will seize, but not search, computers and associated peripheral equipment, other mobile devices, and external and removable electronic media, and will request additional search warrants prior to searching these items. To ensure preservation of relevant evidence, the government will image cellular telephones on site, and will request additional search warrants prior to searching this evidence.

k.  Vehicles parked on the curtilage which are, or reasonably appear to be, under the dominion and control of the targets of this investigation.